## ADOPTION OF G.

Supreme Judicial Court of Maine.

Argued May 1, 1987.
Decided Aug. 19, 1987.

Ricky L. Brunette (orally), Brunette, Shumway, Romanow & Ryer, Portland, for Richard and Brenda M.

Robert C. Robinson (orally), Robinson, Kriger & McCallum, Portland, for Marion and Laura P.

Before McKUSICK, C.J., and ROBERTS,* WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

WATHEN, Justice.

Petitioners Richard and Brenda M. appeal from an order of the Probate Court (Cumberland County) denying their petition

---

* Roberts, J., sat at oral argument and participated in the initial conference, but participated no further.

and granting the petition of Marion and Laura P. to adopt Baby Girl G. On appeal Richard and Brenda M. argue (1) that it was necessary to terminate the parental rights of Richard M., the putative father, before granting the adoption petition of unrelated third parties, Marion and Laura P., (2) that the Probate Court's finding that Richard M. was unable or unwilling to protect Baby Girl G. from jeopardy was clearly erroneous, and (3) that the Probate Court's finding that it was in the child's best interests to be adopted by Marion and Laura P. did not dispense with the requirement for Richard M's. consent and was insufficient to deny Richard M. his parental rights. Although we conclude that the Probate Court's finding of jeopardy was clearly erroneous, we hold that parental rights were appropriately withheld and we affirm the order granting the adoption petition.

## I.

The facts may be summarized as follows: On February 5, 1984, Darlene G., an unmarried woman, gave birth to Baby Girl G. The following day she executed an affidavit of release and an affidavit regarding the putative father in an effort to comply with the requirements of 19 M.R.S.A. §§ 532-A, 532-C (1981 & Supp.1986). In her affidavit she stated that the putative father was unknown, had not provided or attempted to provide support and had not been involved or attempted to be involved in a family relationship. On February 7, 1984, Darlene G. appeared before the judge of the Androscoggin County Probate Court pursuant to 19 M.R.S.A. § 532(4) (1981), to consent to the adoption of her child by Marion and Laura P. The judge determined that she knowingly consented to the

termination of her parental rights. After an examination concerning the putative father the judge determined that notice was not required. Marion and Laura P. took custody of Baby Girl G. and proceeded to their Connecticut home.

On February 13, 1984, Marion and Laura P., residents of Connecticut, presented their petition for the adoption of Baby Girl G. accompanied by Darlene G.'s affidavit regarding the putative father to the Cumberland County Probate Court. On February 23, 1984, while the petition was pending, the Cumberland County Probate Court received a letter from Richard M.'s attorney asserting that Richard M. was the father of Baby Girl G. The attorney stated that the father had not received notice of the adoption proceedings and requested an opportunity to be heard. On March 2, 1984 Richard and his wife, Brenda M., filed an adoption petition in the Cumberland County Probate Court.

After a joint hearing on both petitions[1] the Cumberland County Probate Court issued an order dated February 17, 1987 in which the judge found that Richard M. was the natural father of Baby Girl G., and found by clear and convincing evidence that he was unable to protect the child from jeopardy and that these circumstances were unlikely to change within a time reasonably calculated to meet the child's needs. The court noted that if the child were to live with Richard and Brenda M. "overbearing sibling rivalry, peer pressure, and surrounding neighborhood and family situations [would] adversely affect the child on a long term basis." The court also found that it was in the best interests of the child to live with Marion and Laura P.

---

1. Initially, the Cumberland County Probate Court granted Richard M.'s motion to change the venue with respect to both petitions to the Androscoggin County Probate Court. After three hearings in that court, the judge determined that Richard M. had standing to attempt to qualify as a putative father pursuant to section 532–C. Subsequently, the Probate judge determined that Richard M. was the biological father of Baby Girl G. The judge concluded, however, that the best interests of the child required the court to grant Marion and Laura P.'s petition for adoption. Richard and Brenda

M. appealed to this Court. Finding that the Androscoggin County Probate Court lacked jurisdiction, we vacated the decree. *In re Adoption of G.*, 502 A.2d 1044 (Me.1986). We remanded the case to the Androscoggin County Probate Court with instructions to remit the case to the Cumberland County Probate Court for reinstatement to its docket. By stipulation of the parties, the Cumberland County Probate Court based its decision upon transcripts of the hearings held in the Androscoggin County Probate Court.

because she had been in their care for almost three years and they had provided her with "love, affection and a healthy environment during that time." The court entered an order granting the adoption petition of Marion and Laura P. and denying the petition of Richard and Brenda M. It is from this order that Richard and Brenda M. now appeal.

## II.

■ Petitioners Richard and Brenda M. contend that the father of an illegitimate child automatically has parental rights. The plain language of the adoption statute dispels such an assertion by providing that:

If, after notice, the putative father of the child wishes *to establish* parental rights to the child, he must ... petition the judge of probate to grant him the exclusive care and custody of the illegitimate child. ... The judge shall then fix a date for a hearing *for the purpose of determining the putative father's parental rights to the child.*

19 M.R.S.A. § 532–C (Supp.1986) (emphasis supplied).

Accordingly, the Probate judge appropriately conducted a hearing pursuant to paragraphs six and seven of 19 M.R.S.A. § 532–C (Supp.1986) for the purpose of deciding whether Richard M. should be afforded parental rights. This portion of the statute states:

If, after a hearing, the judge finds that the putative father is the natural father but that, based on *clear and convincing evidence, that parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs,* or has abandoned the child, or has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs, *he shall rule, if it appears to be in the best interest of the child, that the natural father has not established parental rights to that child*

and has abandoned the child, and that only the mother of the illegitimate child must consent to the adoption of that child or execute a surrender and release for the purpose of adoption of that child.

If the judge finds that the putative father is the natural father and that he is willing and able to protect the child from jeopardy, and has not abandoned the child, and is willing and able to take responsibility for the child, *he may rule, if it appears to be in the best interest of the child,* that the natural father has established parental rights to that child. The natural father may then either consent to the adoption of the child or execute a surrender and release for the purpose of adoption of the child. If the natural father will not either consent to the adoption of the child or execute a surrender and release for the purpose of adoption of the child, the judge may grant the exclusive care and custody of the child to the natural father.

19 M.R.S.A. § 532–C (Supp.1986) (emphasis supplied). The Probate Court denied parental rights to Richard M. and tracked the language of paragraph six finding that "[t]he record shows clear and convincing evidence that [Richard M.] is unable to protect the child from jeopardy and these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs." The court based its conclusion on the probability that family, peer and neighborhood pressures would adversely affect Baby Girl G. if she resided with Richard and Brenda M. Petitioners contend that the findings are not supported by clear and convincing evidence.

The standard of review in a case such as this is whether the factfinder could reasonably have been persuaded that the required factual findings were proved to be highly probable. *In re John Joseph V.,* 500 A.2d 628, 629 (Me.1985); *Taylor v. Commissioner of Mental Health,* 481 A.2d 139, 153 (Me.1984). In the closely related context of the termination of parental rights pursuant to 22 M.R.S.A. § 4055(1)(B)(2)(b)(i) (Supp.

1986),[2] we have defined the concept of a parent's inability to protect a child from jeopardy. "We understand the word 'unable' to be synonymous with incapable, and, as employed in its relevant statutory context, to mean that a parent is incapable, for whatever reason, to take responsibility for his or her child." *In re John Jospeh V.*, 500 A.2d at 630. In that same context "jeopardy" is defined as "serious abuse or neglect, as evidenced by ... serious harm or threat of serious harm." 22 M.R.S.A. § 4002(6)(A) (Supp.1986). There is no reason to assign a different meaning to these terms in the present context.

■ In deciding whether Richard M. should be awarded parental rights, the court had before it an "Independent Adoption Study Report" conducted by the Department of Human Services and a report provided by the guardian ad litem. The DHS report concluded that although Richard and Brenda M. had demonstrated their parenting ability with their own two children, their motivation for adopting Baby Girl G. was fueled by guilt and they naively ignored potential complications.

> [Richard and Brenda M] appear to have a warm and loving relationship with their own children, who show evidence of their care and attention. [They] do, however, seem to be very naive, or need to deny the complications of adopting a child under these circumstances.

> .     .     .     .     .

> Their motivation appears to be based somewhat on guilt. [Richard M.] feels guilty for having the affair and parenting the child and [Brenda M.] feels guilty that her supposed rejection of him led him to the affair in the first place. She also feels guilty that she might be forcing him to give his child up for adoption

if she did not fully accept the child and support his petition for adoption.

The report strongly suggests that the motivations of Richard and Brenda M. were not as "joyful" or "clear" as the motivations of Marion and Laura P. There is no evidence in the record, however, that Richard M. would be unable or unwilling to protect Baby Girl G. from serious abuse or neglect. On the contrary, there is evidence that Richard M. has been a good and loving father to his other two children. It is possible to conclude that the factors motivating Richard and Brenda M. are less worthy than those motivating Marion and Laura P. One could also accept the possibility of sibling rivalry and peer pressure in the future. Such conclusions, however, do not establish the inability of the father to protect the child from jeopardy by clear and convincing evidence. The judge's denial of parental rights pursuant to paragraph six of § 532–C was erroneous.

■ Notwithstanding our conclusion with respect to paragraph six, we must also consider the denial of parental rights with reference to paragraph seven of section 532–C. By its terms, paragraph seven permits the denial of parental rights to the father of an illegitimate child solely on a consideration of the "best interests of the child." We review such a determination only for an abuse of discretion.

■ The probate judge, relying on the above-mentioned reports, determined that it was in the best interests of Baby Girl G. to live with Marion and Laura P. The judge noted that she had been residing with them since her birth three years earlier. During that time they had provided her with "love, affection and a healthy environment." In his report, the guardian ad litem stated that it was in the best interests of Baby Girl G. to be adopted by

---

2. Section 4055 employs language identical to that of section 532–C in defining grounds for termination:

   1. Grounds. The court may order termination of parental rights if:

      .     .     .     .     .

      B. Either.
      (2) The court finds, based on clear and convincing evidence, that:

(a) Termination is in the best interest of the child; and
(b) Either:
(i) The parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs;

Marion and Laura P. He noted that they share a "stable, loving relationship with each other, and are financially secure." He observed that the child has resided with Marion and Laura P. since four days after her birth and thus a parent-child bond has developed. The report concluded that to separate the child from Marion and Laura P. and place her in a volatile emotional setting with Richard and Brenda M. would cause her great harm. The DHS reports made similar observations. The probate judge did not abuse his discretion in denying Richard M. parental rights pursuant to paragraph seven of § 532–C.

### III.

Having determined that parental rights were appropriately withheld in accordance with paragraph seven, we must now determine whether the order granting the adoption petition is defective because of the absence of the father's consent.[3]

Paragraph seven of section 532–C authorizes a judge to withhold parental rights from a natural father on the basis of the best interests of the child. It is only when a natural father acquires parental rights—a step beyond simply demonstrating his fitness—that he acquires a veto power over the adoption of the child. Because Richard M. failed to establish parental rights to Baby Girl G., his consent to her adoption was not required.

The entry is:

Judgment affirmed.

All concurring.

---

3. 19 M.R.S.A. § 532 (1981) provides as follows:
  1. Consent required. Before any adoption is granted, written consent to the adoption must be given by:
  .  .  .  .  .
  B. Each of the child's living parents, except as provided in subsection 2:

.  .  .  .  .
  2. Consent not required. Consent to adoption shall not be required of the following:
  .  .  .  .  .
  B. A father who is not required to give consent under section 532–C.